[No. 24173.  Department One.  January 19, 1933.]

STUART BRYAN, *Appellant*, v. FIDELITY & CASUALTY
COMPANY OF NEW YORK, *Respondent*.[1]

*Charles A. Wallace,* for appellant.
*Karr & Gregory* and *J. K. Forrest,* for respondent.

MITCHELL, J.—This is an action on an indemnity
bond issued by the Fidelity & Casualty Company of
New York, a corporation, hereinafter called the Bond
Company, to J. P. Todd, Inc., employer, indemnifying

[1]Reported in 18 P. (2d) 482.

it against loss, not exceeding five thousand dollars, of money or property through the embezzlement, larceny, wrongful abstractions or other acts of fraud or dishonesty of Frank W. Wade, employee. The suit was brought by Stuart Bryan on an assigned claim of the employer in the amount of the bond, on account of alleged misappropriations in excess of that amount of the employer's money by Wade while the bond was outstanding.

One of the defenses to the action was fraud on the part of the employer upon whose statement the Bond Company relied in issuing the bond. The trial without a jury resulted in findings, conclusions and judgment for the defendant. The plaintiff has appealed.

In presenting the assignments of error, the brief on behalf of appellant says:

"The plaintiff has made nine assignments of error, all of which go to the one question in the case: Did the defendant have a right under the laws of this state, as interpreted by the decision of our supreme court, to plead and prove the employer's statement exhibit '9'?"

It appears that, in February, 1926, Hans Heidner, M. J. Heidner and Frank W. Wade organized J. P. Todd, Inc., which thereafter operated as a corporation engaged in the fish brokerage business in Seattle. The capital stock of the corporation consisted of two hundred shares of the par value of one hundred dollars each, of which Hans Heidner subscribed and paid for one hundred shares and M. J. Heidner one share, and Wade subscribed for ninety-nine shares which were placed in escrow, for which he gave his promissory note to be paid on the installment plan, the stock to be delivered to him when payments for it were completed. Hans Heidner became president, M. J. Heidner vice-

president, and Frank W. Wade secretary and treasurer of the corporation.

Wade continuously withdrew wrongfully more money than he was entitled to, with the result that dissensions arose which resulted in a deal on April 26, 1929, among the officers and stockholders, by which both of the Heidners endorsed their stock in blank and placed it in escrow, to be delivered to Wade upon his paying for it at a price agreed upon between them. Thereupon, Wade became manager of the corporate business and continued as secretary and treasurer.

This deal or change in the business required Wade to furnish an indemnity bond, and accordingly he made a written application in his own name to the respondent for a fidelity bond running to J. P. Todd, Inc., as obligee, covering the integrity and honesty of Wade as manager of the corporation. Before issuing the bond, however, J. P. Todd, Inc., executed and delivered to the Bond Company a written instrument designated "Employer's Statement," containing representations with respect to the accounting and auditing plans and conditions with respect to the position of manager, and also statements concerning the personal conduct, performance of the duties, etc., of Frank W. Wade, which employer's statement was intended as information to the Bond Company with reference to the issuing of the bond in suit.

There are several features of the employer's statement tending to show misstatements and concealment, which we think were established by a clear preponderance of the evidence, but we shall refer to only one, which is set out in the trial court's findings, as follows:

"In the said 'Employer's Statement' in answer to the question under the sub-head 'B': 'If an old employe, has he uniformly given satisfaction in his personal conduct and performance of duties and kept his

accounts faithfully and without default?' The answer is, 'As far as we know,' which answer was written in the handwriting of Hans Heidner, president, and signed by him as president of J. P. Todd, Inc., which answer was utterly and wholly untrue and deceitful, and was made for the purpose of misleading and deceiving the defendant and for the purpose of procuring the issuance of a fidelity bond which the said Hans Heidner believed would not be issued if the said question was truthfully answered, and that the falsity of said statement, answer and concealment consisted in this: The said Hans Heidner well knew that beginning with the year 1927 the accounts had not been kept faithfully and without default and that the personal conduct and performance of the duties of the said Frank W. Wade had not given uniform satisfaction.''

At the trial, the employer's statement was admitted in evidence over objections of the appellant and was marked ''exhibit 9.'' This exhibit, the authenticity and delivery of which is not in dispute, was admitted in support of respondent's allegation of fraud:

Appellant relies on Rem. Rev. Stat., § 7075, and the case of *Washington Fire Relief Association v. Albro,* 130 Wash. 114, 226 Pac. 264. Both appellant and respondent refer to the case of *Southwestern Surety Ins. Co. v. Hico Oil Mill,* 229 S. W. (Tex. Com. App.) 479, and, in our opinion, a faithful consideration of these authorities will show that the assignments of error are without merit.

To avoid confusion, three things should be kept in mind. First, the bond in suit runs to one other than the one who made the *application* for it, and hence differs from a contract such as a fire insurance policy where the insured makes the application for the policy; second, there were two written instruments delivered to the Bond Company, (1) Wade's *application* for the bond, and (2) the offending exhibit 9, known as the *employer's statement;* and third, that the judgment

rests upon the fraud shown by the *employer's statement* taken in connection with the facts as the employer knew them to be, and not at all by anything wrong in the written *application* or any of its terms.

Section 7075 of the code reads:

"Every contract of insurance shall be construed according to the terms and conditions of the policy, except where the contract is made pursuant to a written application therefor, and such written application is intended to be made a part of the insurance contract, and the insurance company making such insurance contract, unless as otherwise provided by this act, shall deliver a copy of such application with the policy to the assured, and thereupon such application shall become a part of the insurance contract, and failing so to do it shall not be made a part of the insurance contract."

More specifically, appellant's argument is that the bond must be construed according to its terms and conditions as provided by the statute, without reference to exhibit 9, because a copy of the exhibit was not delivered with the bond to the assured, J. P. Todd, Inc., and hence, never became a part of the contract.

Appellant's argument mistakes the statute. Exhibit 9 was not an *application* for a bond or policy, nor is there anything about the exhibit or the bond, even considering all of the circumstances surrounding the transaction, indicating that exhibit 9 was *intended to be made* a part of the contract. Appellant does not, of course, claim it became a part of the contract, but, on the contrary, objects to it altogether. Certainly, the respondent neither alleged nor has it contended that exhibit 9 ever became a part of the contract, but on the contrary contends that it, with other proof of fraud, vitiates, rather than becomes a part of, the contract on which the suit is brought.

The exhibit is not an *application* at all. It is not so

designated, but on the contrary, it is designated *Employer's Statement,* which was alleged and shown to be a misstatement and concealment of material facts inducing the making of the contract in suit. *Wade* made the written application for the bond, and it was admitted in evidence, but his application had nothing to do with the allegation or. proof of fraud with which the obligee in the bond was charged and for which purpose exhibit 9 was admitted.

The case of *Washington Fire Relief Association v. Albro,* 130 Wash. 114, 226 Pac. 264, does not afford appellant's contention any support. That was a case of a fire insurance policy in which the assured in a written application for the policy in his favor falsely stated there was no other insurance on the property. A copy of the application was not delivered with the policy, and in a suit on the policy, the insurance company was allowed, over objections, to introduce the written application in support of its charge of fraud against the assured in procuring the insurance, but on appeal it was held the application for the policy was not admissible because a copy of it was not delivered with the policy as required by Rem. Rev. Stat., § 7075, in order to make it a part of the contract; but recognizing the distinction between what becomes a part of such a contract and what, if anything, is done by way of fraudulently inducing an insurance company to make a contract, it was said, in ordering a new trial:

"The cause is remanded with instructions to grant a new trial, at which the appellant may introduce evidence attempting to establish its allegations that false and fraudulent means were resorted to in securing the policy, although the application is inadmissible for any purpose, and allowing the appellant to introduce evidence as to statements made by the respondents in regard to other insurance, both at the time of procuring the policy and procuring a settlement thereunder, and

also evidence in regard to the value of the property as affecting the question of whether the respondents were over-insuring the property, as indicating fraudulent intent.''

The case of *Southwestern Surety Ins. Co. v. Hico Oil Mill,* 229 S. W. (Tex. Com. App.) 479, is illustrative of the difference between an *application* for a bond made by an employee as compared with an *employer's statement* concerning the issuance of it. That case involved a fidelity bond which was applied for in writing by one Scales, an employee. The purpose of the bond was to protect the Hico Oil Mill, of which C. H. Bencini was sole owner, against loss resulting from acts of fraud or dishonesty on the part of Scales amounting to larceny or embezzlement. Scales signed and delivered a written instrument called an ''application,'' and Bencini, by a separate written instrument, signed and delivered to the surety company answers to questions propounded to him, among other things, concerning Scales' connection with the business. This instrument was denominated ''Employer's Statement.'' A statute of Texas in force at that time (R. S. 1911, Art. 4951) provided that

''Every contract or policy of insurance issued or contracted for in this state shall be accompanied by a written, photographic or printed copy of the application for such insurance policy or contract, *as well as a copy of all questions asked and answers given thereto.*''

A copy of the employer's statement was not furnished with the bond when the bond was delivered, and upon a suit on the bond, it was held that the employer's statement was not admissible in evidence because of the words *''as well as a copy of all questions asked and answers given thereto''* contained in the statute. That is, it was argued that a copy of the application

and also a copy of the employer's statement should accompany the policy because the statute, as the court construed it, said so. But our statute has no provision like the one in the Texas statute with respect to questions and answers in the employer's statement, and upon which the particular holding in that case was made. However, there was a holding in the Texas case, the reason of which is pertinent and applicable here, viz:

"We agree that Bencini's statement was not a part of the application made by Scales. Its nature and purpose forbid the conclusion that it was. It had been filled out, signed, and sent in before the company communicated with Bencini. The evident purpose of the inquiry directed to him was for the purpose of securing information to be used in determining whether the bond applied for should be issued. Clearly the questions asked Bencini and his answers thereto are not within that provision of the statute requiring a copy of the application to accompany the policy."

Exhibit 9 was properly admitted in evidence.

Notwithstanding the reduction on behalf of the appellant of all of the assignments of error to one contention, as heretofore stated, it is contended that, from all the evidence, it was shown there was no fraudulent statement contained in the employer's statement, exhibit 9. In disposing of this argument, it must be noticed that, in addition to facts found by the trial court and already referred to, the court made and entered the following finding:

"That beginning with the year 1927 and continuing at all times thereafter Frank W. Wade's account was overdrawn on the books of the corporation, his overdraft on September 30, 1927, being $478.89, on April 30, 1928, being $3,715.26, on September 30, 1928, being $4,591.94, and on April 24, 1929, being $7,264.82, said overdrafts being occasioned by withdrawals from the funds of the company made by the said Frank W.

Wade and applied to his personal use, and that at all times during said period Hans Heidner, the president of the company, knew of the existence of said overdrafts and remonstrated with the said Frank W. Wade concerning them, . . . ''

The trial court further found that Hans Heidner knew that the employer's statement made and signed by him would be relied on by the Bond Company and was presented to the Bond Company ''for the purpose of securing the issuance of the bond in suit;'' that the Bond Company, in issuing the bond, relied on these statements as being true and correct; that they were false and fraudulent, and deceitfully stated for the purpose of concealing material facts; that the true facts were not known to the Bond Company, else it would not have issued the bond; and that, two days after the bond was issued, Hans Heidner resigned as president of J. P. Todd, Inc., and M. J. Heidner resigned as vice-president of the company, leaving Wade in sole control of the affairs of the company. These findings are, in our opinion, supported by a clear preponderance of the evidence, and establish the fraud charged against J. P. Todd, Inc., which fraud vitiated the bond upon which the suit was brought.

Judgment affirmed.

MILLARD, STEINERT, PARKER, and TOLMAN, JJ., concur.